UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

CARL R. HARRIS,                          )
                                         )
        Plaintiff,                       )
                                         )
v.                                       )        No. 3:21-CV-332-DCP
                                         )
JTEKT AUTOMOTIVE TENNESSEE –             )
MORRISTOWN, INC.                         )
                                         )
        Defendant.                       )

**MEMORANDUM AND ORDER**

This case is before the undersigned pursuant to 28 U.S.C. § 636(c), Rule 73(b) of the

Federal Rules of Civil Procedure, and the consent of the parties, for all further proceedings,

including entry of judgment [Doc. 16].

Now before the Court is Defendant's Motion for Summary Judgment [Doc. 27]. Plaintiff

filed a response opposing the motion [Doc. 29] and Defendant replied [Doc. 31]. The motion is

ripe for adjudication. *See* E.D. Tenn. L.R. 7.1(a). Accordingly, for the reasons explained below,

the Court **DENIES** Defendant's motion [**Doc. 27**].

**I.      BACKGROUND**

This suit arises under the Americans with Disabilities Act Amendments Act of 2008

("ADAA") for failure to accommodate and disability discrimination. *See* 42 U.S.C. § 12112

(2020). The following facts are undisputed unless noted otherwise.

Carl Harris ("Plaintiff") contends that he has had seizures throughout his life, starting when

he was four years old [Doc. 28-1 pp. 12–13 (Excerpts from Plaintiff's Deposition)]. Following

brain surgery in 2006, Plaintiff maintains that his seizures are controlled with medication [*Id.* at

4].

From 2006 until 2015, Plaintiff received Social Security disability benefits [*Id.*; Doc. 28 p. 2]. On November 19, 2015, Plaintiff began working for JTEKT Automotive ("Defendant") as a machine operator [Doc. 28-1 p. 5]. Defendant was aware when it hired Plaintiff that he had epilepsy and that he was able to work in safety sensitive jobs while on his current medication as indicated by the Pre-Employment Physical Evaluation Results [Doc. 28-2 p. 2].

Initially, Plaintiff worked on the AP pump line making pumps where, he asserts, that he worked sixty-five to seventy hours per week, with structured hours, and rotating weekends off [Doc. 28-1 pp. 5–6]. In 2017, Plaintiff voluntarily switched to the CVJ line making shafts [*Id.* at 5, 7]. The job description for a CVJ Machining Tech A ("A Tech") includes "operat[ing] manufacturing equipment[,]. . . willing and able to work any shift[, and]. . . [a]bility to work overtime is an essential function of the position" [Doc. 28-3 p. 2]. Under the section labeled, "Work Environment/Physical Demands[,]" the job description states: "[t]he employee works an 8 or 10 hour shift and overtime is required, as needed. Overtime may be required with very short notice" [*Id.* at 3]. It also states that "[t]he performance of this position requires exposure to manufacturing areas which require the use of personal protective equipment such as steel toed shoes, safety glasses with side shields and mandatory hearing protection" [*Id.*].

While working for Defendant on the CVJ line, Plaintiff was sometimes required to work long hours, including "seven-day workweeks, mandatory overtime, ten (10) to twelve (12) hour workdays, and workweeks which often exceeded seventy (70) hours" [Doc. 22 p. 2; *see also* Doc. 28-6; Doc. 28-1 pp. 6–7]. Plaintiff avers that his work schedule on the CVJ line was more chaotic than on the AP line, often interrupting his sleep, which interfered with his seizure medication and resulted in an increased number of seizures beginning around the fall of 2019 [Doc. 22 p. 2; Doc. 28-1 pp. 6–7]. Plaintiff gave an example in which he worked a twelve-hour shift until 11:00 a.m.,

got home and to sleep around 1:00 p.m., but received a call from work around 2:30 p.m. asking if he could come into work at 6:00 p.m. to work another twelve-hour shift because Defendant was short staffed [Doc. 29-14 pp. 10–11].

On May 9, 2017, Plaintiff had his first seizure at work which caused him to fall onto the table where he was examining parts [Doc. 28-1 pp. 14–15; *see also* Doc. 28-4 p. 2]. While he appeared to be alright, he was taken to the hospital [Doc. 28-4 p. 2] and subsequently released the same day with an instruction to visit his primary care doctor [Doc. 29-9 p. 8].

In December 2018, Plaintiff had a second seizure at work [Doc. 28-1 pp. 16–17]. An employee noticed that Plaintiff was looking "woozy" and having trouble walking prior to passing out [Doc. 28-5]. The employee was able to lay Plaintiff on the floor and contact EMTs to assist [*Id.*]. Plaintiff was transported to the hospital for evaluation and ultimately released [*Id.*].

On October 13, 2019, Plaintiff had a third seizure while at work, and one of his coworkers found him with his head lying on the conveyor of a machine [Doc. 28-1 pp. 18–19]. Plaintiff was taken to the hospital and was discharged with instructions to follow-up with his doctor [*Id.* at 19]. As instructed, Plaintiff visited his neurologist, Dr. Fredric Radoff ("Dr. Radoff"), on October 17, 2019 [Doc. 28-8]. Dr. Radoff cleared Plaintiff to return to work on December 1, 2019, without restrictions [Doc. 28-10]. Dr. Radoff's notes from Plaintiff's visit state that Plaintiff "mention[ed] that he had just drove back to Tennessee after being on vacation and the strain could have also contributed in bringing on the seizure" [Doc. 28-8 p. 2]. In the weeks leading up to Plaintiff's seizure, his pay records reflect he worked 90 hours, including 8 hours of overtime, from September 9 to September 22; 98.50 hours, including 10.5 hours of overtime and 8 hours of double time[1] from

---

[1]     "Double time" refers to work hours on Sunday when employees are paid double their hourly rate [Doc. 28-1 p. 25].

September 23 to October 6; and 1.25 hours from October 7 to October 20 because Plaintiff took 40 hours of vacation during that time [Doc. 28-7; *see also* Doc. 28-14 pp. 24–27].

The following year, on October 17, 2020, Plaintiff had a fourth seizure at work [Doc. 28-1 p. 42]. This time Plaintiff refused medical care for fear of the financial impact [*Id.*]. Defendant prepared an incident report, stating that Plaintiff "had been working a 12 hour shift [be]cause of shortage of manpower" and was on his way to his break when "he fell forward from what could be a seizure and blacked out whilst hitting his head on the door" [Doc. 28-11]. Plaintiff also experienced neck soreness and incurred a laceration on his lip [Doc. 28-1 p. 42]. No one found Plaintiff "until after 5:25 AM, and there is no way to know how long he was laying there" [Doc. 28-11]. The report further states that "[u]pon waking up, he had no idea of where he was, or how he got there or what happened" [*Id.*]. After this incident, Plaintiff took leave pursuant to the Family and Medical Leave Act from October 18, 2020, to January 13, 2021 [Doc. 28-1 p. 38]. Leading up to this seizure, Plaintiff worked 56 hours, including 8 hours of overtime and 8 hours of double time, and took 32 hours of vacation from September 9 to September 20; 80 hours, including 8 hours of overtime, and took 8 hours of vacation from September 21 to October 4; and 39.75 hours, including 15.75 hours of overtime, and 56 hours of vacation from October 5 to October 18 [Doc. 28-12; Doc. 28-1 pp. 31–34]. Similar to the seizure Plaintiff had in October 2019, this seizure occurred on Plaintiff's first day back to work after he and his wife drove back to Tennessee from a vacation in Florida [Doc. 28-1 p. 34].

Prior to returning to work, Plaintiff claims that Defendant required him to provide a release from his medical provider stating that he could return to work without restriction [*Id.*]. Defendant's Human Resources Manager, Kathy Howerton ("Ms. Howerton"), stated that if the doctor's note included restrictions, then the ADAA process would be triggered [Doc. 29-15 p. 3].

4

As part of this process, Dr. Radoff sent Defendant three letters regarding Plaintiff returning to work. In a letter dated November 12, 2020, Dr. Radoff stated Plaintiff could "return to work as his usual occupation" and that Plaintiff's "work stress can be triggering more seizures" thus "minimizing work stress could be beneficial for him" [Doc. 28-13 ("First Letter")]. On November 30, 2020, Ms. Howerton called Plaintiff to discuss Dr. Radoff's letter [Doc. 28-14]. Ms. Howerton's notes from that conversation indicate that Plaintiff raised concerns about needing to sleep and having more structure and that Plaintiff believes overtime at the last minute is causing him stress [*Id.*]. Ms. Howerton advised Plaintiff that "we need to understand what the doctor means by stating, 'minimizing work stress'" [*Id.*]. Ms. Howerton indicated that she would email Plaintiff a reasonable accommodation request form and Plaintiff's job description to share with Dr. Radoff [*Id.*].

On December 2, 2020, Plaintiff submitted a Reasonable Accommodation Request Form requesting structured hours and to be notified of overtime hours in advance [Doc. 28-15]. In response to the question asking what, if any, job function he was having difficulty performing, Plaintiff wrote "none" [*Id.*].

In his second letter to Defendant, dated December 4, 2020, Dr. Radoff stated that Plaintiff is taking anticonvulsant medication, is compliant with that medication, and has not had any recent seizure activity [Doc. 28-17 ("Second Letter")]. Dr. Radoff clarified that Plaintiff does not require any physical limitations but that he "needs to work a maximum of 65 hours per week" and that Plaintiff could return to his usual work on December 13, 2020 [*Id.*]. In response, Defendant sent Dr. Radoff a letter dated December 22, 2020, asking the following questions:

1) Are these anticonvulsant medications new to [Plaintiff]?

2) Was he taking these anticonvulsant medications at the times he passed out on the job?

3) Can these medications be taken while operating industrial equipment?

4) What stressors at work need to be avoided?

[Doc. 28-19]. On January 5, 2021, Ms. Howerton emailed Plaintiff stating that she had sent Dr. Radoff the letter but had not yet heard back from his office [Doc. 28-18]. Plaintiff responded on January 7, 2021, and stated that he had sent the paperwork to Dr. Radoff and that the doctor "has [him] out until January 19th now" because he has an appointment with Dr. Radoff on January 18 [*Id.*].

Dr. Radoff sent Defendant a third letter dated January 7, 2021, in which he wrote:

> In response to your questions: question 1, these anticonvulsant medications are not new to [Plaintiff]; question 2, he was taking these anticonvulsant medications when he passed out on the job; #3, can these medications be used while operating industrial equipment, probably yes, but depending on side effects such as somnolence or dizziness for example, it would not be safe for him to operate industrial equipment.
>
> Stressors that need to be avoided would include fatigue, nervousness, and sudden noises, for example.

[Doc. 28-21 ("Third Letter")].

Defendant terminated Plaintiff's employment on January 28, 2021 [Doc. 29-7]. Ms. Howerton's call log reflects that she advised Plaintiff that Defendant was unable to "accommodate his restrictions and employment was terminated" [*Id.*]. Ms. Howerton also noted: "Carl's medical restrictions state it is not safe for him to work in an industrial manufacturing. See letter from Dr. Radoff dated Jan. 7, 2021" [*Id.*].

## II.   POSITIONS OF THE PARTIES

Defendant filed a Motion for Summary Judgment [Doc. 27], contending that there are no genuine issues of material fact and that it is entitled to summary judgment as a matter of law on Plaintiff's claims. First, Defendant argues that Plaintiff cannot establish a prima facie case of

discrimination under the ADAA because he poses a direct threat and therefore cannot demonstrate that he is a "qualified individual" [Doc. 28 pp. 11–15]. Defendant maintains that Plaintiff posed a direct threat to himself and others because his epilepsy is a lifelong condition that cannot be controlled by medicine, he has had multiple seizures at work, at least one of which resulted in him being hospitalized, and the "evidence indicates that the risk of harm was imminent" [*Id.* at 13–14; Doc. 31 pp. 4–7]. Second, Defendant argues that it was justified in terminating Plaintiff's employment because his proposed accommodations were unreasonable [Doc. 28 p. 15; Doc. 31 p. 3 n.3]. Based on Dr. Radoff's Third Letter, Defendant "determined it was unsafe for Plaintiff to work in an industrial environment" and that Plaintiff is unable to show that there were reasonable accommodations that could have made the worksite safe for him [Doc. 28 p. 16]. Finally, Defendant contends that there is no evidence to show that Plaintiff's proposed restrictions, namely limiting him to sixty-five hours of work per week with advanced notice of any changes or overtime, would have prevented him from having seizures at work [*Id.* at 17–18; Doc. 31 p. 4].

Plaintiff filed a Response [Doc. 29], arguing that he has established a prima facie case of disability discrimination because he can show that he is otherwise qualified for his position despite his disability [*id.* at 7]. Plaintiff contends that this element is "not onerous, but one easily met" and that he is able to meet this standard as evidenced by Dr. Radoff's letters that repeatedly state that Plaintiff is clear to return to work [*Id.* at 8–9 (quoting *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000))]. Although Dr. Radoff's Third Letter stated that it would be unsafe for Plaintiff to operate industrial equipment if he experienced certain side effects of his seizure medication such as somnolence and dizziness, Plaintiff argues that he has never experienced those side effects while taking his medication and that Defendant never inquired whether he had experienced these side effects [*Id.* at 10]. Plaintiff also argues that Defendant cannot show that

7

Plaintiff poses a "direct threat" based on the objective medical evidence available because Dr. Radoff's letters state that Plaintiff could return to work and Defendant is unable to show that Plaintiff poses a substantial risk of harm to himself or others [*Id.* at 12–14].

## III. STANDARD OF REVIEW

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of establishing that no genuine issues of material fact exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n. 2 (1986); *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 339 (6th Cir. 1993). All facts and all inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Kiefer*, 301 F.3d 937, 942 (6th Cir. 2002).

"Once the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations." *Curtis v. Universal Match Corp.*, 778 F. Supp. 1421, 1423 (E.D. Tenn. 1991) (citing *Celotex*, 477 U.S. at 317). To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

The Court's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the finder of fact. *Id.* at 250. The Court does not weigh the evidence or determine the truth of the matter. *Id.*

at 249. Nor does the Court search the record "to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). Thus, "the inquiry performed is the threshold inquiry of determining whether there is a need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson,* 477 U.S. at 250.

## IV.    ANALYSIS

Plaintiff brings two claims under the ADAA – failure to accommodate and disability discrimination. For the reasons explained below, the Court finds that Defendant has not met its burden of showing that there are no genuine issues of material fact on either claim. *See* Fed. R. Civ. P. 56(a).

"The ADA[A] makes it unlawful for an employer to 'discriminate against a qualified individual on the basis of a disability.'" *Rorrer v. City of Stow,* 743 F.3d 1025, 1038 (6th Cir. 2014) (quoting 42 U.S.C. § 12112(a)). "An employer must provide reasonable accommodations for the known limitations of an otherwise qualified employee with a disability, unless doing so would impose an undue hardship." *Siewertsen v. Worthington Steel Co.*, 134 F. Supp. 3d 1091, 1101 (N.D. Ohio 2015) (citing 42 U.S.C. § 12112(b)(5)(A)), *aff'd sub nom.* 783 F. App'x 563 (6th Cir. 2019). To prevail on a claim under the ADAA, a plaintiff must show that he is (1) disabled and (2) "'otherwise qualified' for the position despite . . . [his] disability: (a) without accommodation from the employer; (b) with an alleged 'essential' job requirement eliminated; or (c) with a proposed reasonable accommodation." *Veith v. Tyson Fresh Meat, Inc.*, No. 3:19-CV-01065, 2022 WL 1231229, at *4 (M.D. Tenn. Apr. 26, 2022) (citation omitted) (quoting *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400 (6th Cir. 2021)).

9

The Court will first address the failure to accommodate claim and then turn to the disability discrimination claim.

## A. Failure to Accommodate

The traditional *McDonnell Douglas* burden shifting approach for discrimination cases is not applicable to a failure to accommodate claim.[2] *Veith*, 2022 WL 1231229, at *4 ("ADA claims premised on a failure to accommodate 'necessarily involve direct evidence and the [*McDonnell-Douglas*] burden shifting approach is not applicable.'" (footnote omitted) (quoting *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 416 (6th Cir. 2020))). This is because the ADAA defines "discrimination" as the failure to accommodate, which means "if the fact-finder accepts the employee's version of the facts, no inference is necessary to conclude that the employee has proven this form of discrimination." *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007) (citation omitted).

Under the direct evidence framework for failure to accommodate claims under the ADAA, the plaintiff bears the burden of establishing "(1) that he is disabled, and (2) that he is 'otherwise qualified' for the position despite his . . . disability: (a) without accommodation from the employer;

---

[2]  Under the *McDonnell Douglas* framework for a Title VII discrimination claim, once a plaintiff makes out a prima facie case of discrimination, the burden shifts to the defendant "'to articulate some legitimate, nondiscriminatory reason for' the adverse employment action." *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 606–07 (6th Cir. 2019) (quoting *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 397 n.9 (6th Cir. 2008) (citations omitted). "Should the defendant do so, the plaintiff then must prove by a preponderance of the evidence that the stated reasons were a pretext for discrimination." *Id.* To prevail on a failure to accommodate claim, a plaintiff must make out a prima facie case of discrimination "but a plaintiff that does so need not survive the second and third stages of an indirect-evidence analysis under *McDonnell Douglas*, because *McDonnell Douglas* is simply inapplicable." *Veith*, 2022 WL 1231229, at *4. Nevertheless, a form of burden shifting is contemplated even under the direct-evidence approach as further explained above. *Id.* at *4 n.4.

(b) with an alleged 'essential' job requirement eliminated; or (c) with a proposed reasonable accommodation." *Fisher*, 951 F.3d at 417 (citation omitted) (quoting *Kleiber*, 485 F.3d at 869). If the plaintiff establishes these elements, then the burden shifts to the defendant to "prov[e] that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon" the defendant. *Kleiber*, 485 F.3d at 869.

The court in *Veith* applied this standard to a motion for summary judgment stating:

> [T]he question is whether the defendant has shown that the plaintiff cannot raise a genuine dispute of material fact as to either (i) the non-existence of at least one of the two elements of the plaintiff's *prima facie* case, or, alternatively, (ii) the existence of at least one of the two alternative defenses. A defendant can choose either (a) to focus only on the initial showing that plaintiff cannot establish a *prima facie* case; (b) to make each of the above two showings in turn, or (c) to skip the first option and proceed directly to attempting to show that there is no genuine dispute as to the applicability of one of the defenses.

*Veith*, 2022 WL 1231229, at *4.

Neither party disputes that Plaintiff is disabled [*See* Doc. 22 ¶ 32; Doc. 28 p. 12]. Instead, the parties only disagree whether Plaintiff is "otherwise qualified" for his position as an A Tech as a result of his disability. Defendant argues that Plaintiff is not a "qualified individual" because (1) his proposed accommodations would not be effective in preventing or mitigating his seizures [Doc. 28 pp. 15–18]; (2) he could not safely perform the essential functions of his job because Defendant could not control sudden loud noises, and it was not safe for Plaintiff to work in an industrial environment [*id.* at 8–9; Doc. 30 pp. 2–4]; and (3) he poses a direct threat [Doc. 28 pp. 12–15]. Plaintiff responds that (1) he is able to perform the essential functions of his job with the reasonable accommodations he requested as evidenced by Dr. Radoff's letters that repeatedly stated Plaintiff could return to work [Doc. 29 pp. 9–11]; (2) he could wear noise canceling headphones to protect against sudden noises, but Defendant did not further engage in the

interactive process to determine such an accommodation [*id.* at 24–25], and Dr. Radoff's Third Letter never concluded that it was unsafe for him to work in an industrial environment [*id.* at 17–18]; and (3) Defendant cannot show that he is a direct threat based on the medical evidence on record [*id.* at 13–18].[3]

In discussing whether Plaintiff is "otherwise qualified" for his position, the Court will consider whether Plaintiff has shown that the requested accommodations were reasonable to perform his job and whether Defendant has shown that the requested accommodation eliminates an essential job function or poses an undue hardship. The Court will separately address Defendant's argument that Plaintiff posed a direct threat.

### 1. "Otherwise Qualified"

"The term 'qualified individual' means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C.A. § 12111 (West). "Whether a job function is essential is a question of fact that is typically not suitable for resolution on a motion for summary judgment." *Keith v. Cnty. of Oakland*, 703 F.3d 918, 925–26 (6th Cir. 2013) (citation omitted). "When accommodation is necessary to enable a plaintiff to perform the essential functions of the position in question, it is the plaintiff's burden to propose an accommodation that is 'objectively reasonable.'" *Id.* at 927 (quoting *Kleiber*, 485 F.3d at 870).

Here, Plaintiff's requested accommodations were to work a maximum of sixty-five hours per week [Doc. 28-17] and be provided advanced notice of overtime [Doc. 28-15]. Defendant argues that Plaintiff has not provided evidence to show that it could have made the worksite safe

---

[3] Plaintiff also argues in a footnote that Defendant's return to work policy was illegal in that it required Plaintiff to return without any restrictions [Doc. 29 p. 16 n.3]. Defendant denies that it has a "100% healed" policy [Doc. 31 pp. 8–9]. In light of the Court's findings above, the undersigned does not need to address this issue.

by limiting Plaintiff's hours per week and providing advanced notice of overtime because doing so in the past has not proven to prevent Plaintiff's seizures [Doc. 28 pp. 16–17]. Defendant points to the fact that two of Plaintiff's seizures that occurred at work happened the day he returned from weeklong vacations and when Plaintiff was given advanced notice of his hours [Doc. 28-1 pp. 26, 32–35]. However, all three of Dr. Radoff's letters stated that Plaintiff could return to work and the Second and Third Letters include the proposed accommodations of working a maximum of sixty-five hours per week and to avoid stressors including fatigue, nervousness, and sudden noises [Docs. 28-13; 28-17; 28-21]. In addition, Plaintiff points out that while his hours may have been preplanned leading up to his seizures, that does not mean that they were not communicated to him on short notice [Doc. 29 pp. 23–24 n.6]. According to Plaintiff, on October 17, 2020, he asked to go home because he was tired, but his request was denied [*Id.* at 24 n.6 (citing Doc. 29–14 pp. 12–13)]. He then suffered a seizure [*Id.*].

Moreover, there is evidence upon which a reasonable juror could find it was reasonable to limit Plaintiff to sixty-five hours of work per week and provide advanced notice of overtime. Ms. Howerton stated in her deposition that Defendant's goal is to keep employees under sixty-five hours and that a regular week is forty hours [Doc. 29-15 p. 10]. Ms. Howerton also stated that Defendant has a production meeting every Wednesday to determine whether employees will need to work overtime that coming week [*Id.* at 8]. Defendant's Team Leader, James Guinn[4] ("Mr. Guinn") stated in his deposition that there were other people available for overtime besides Plaintiff and that if he "was told that [he] wasn't allowed to call [Plaintiff], then [he] would have had to go to the next person" to see if they were available to work overtime [Doc. 29-16 pp. 5–6].

---

[4] Mr. Guinn, as Team Leader, is responsible for "filling vacanc[ies] on his shift when someone failed to show for their shift" [Doc. 29 p. 21].

Based on the depositions of Ms. Howerton and Mr. Guinn, the Court finds that Plaintiff has put forth sufficient facts showing that limiting him to sixty-five hours of work per week and giving him advanced notice of overtime were reasonable accommodations [*See* Doc. 29-15 p. 10; Doc. 29-16 pp. 5–6]. *See Blanchet v. Charter Commc'ns, LLC*, 27 F.4th 1221, 1230 (6th Cir. 2022) ("A reasonable jury could find that [the plaintiff's] proposed accommodation was reasonable from the fact that [the defendant] considered it reasonable.").[5]

The burden now shifts to Defendant to show that Plaintiff's requested accommodations eliminate an essential job function or pose an undue hardship. *See Fisher*, 951 F.3d at 417. First, Defendant contends that the "[t]he ability to work overtime, including overtime on very short notice, was an essential function of the job" [Doc. 28 p. 3 (citations omitted)]. The job description for the A Tech position on the CVJ line includes being able to work any shift and overtime [Doc. 28-3]. In determining essential functions "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C.A. § 12111 (West); s*ee also* 29 C.F.R. § 1630.2 ("Evidence of whether a particular job function is essential includes [among other things] . . . (i) The employer's judgment as to which functions are essential; [and] (ii) Written job descriptions prepared before advertising or interviewing applicants for the job[.]").[6]

---

[5]     Defendant also argues that "Plaintiff has offered no evidence that he was qualified to safely perform the essential function of his job" beyond his own personal assessment [Doc. 31 p. 4 (citing cases holding that a plaintiff's opinion of his/her own abilities is insufficient to show that a plaintiff is qualified to perform the essential functions of their job)]. The Court has reviewed the cited cases and finds them distinguishable because Plaintiff does not solely rely on his own assessment but also relies on Dr. Radoff's opinion [*See* Docs. 28-13, 28-17, and 28-21].

[6]     The Code of Federal Regulations provides further detail regarding when a job function is essential. 29 C.F.R. § 1630.2. A job function may be considered essential because: (1) "the reason the position exists is to perform that function"; (2) "of the limited number of employees available

14

The job description provided by Defendant, however, does not state that the employee must be able to work any shift back-to-back nor does it define short notice [Doc. 28-3]. Further, Plaintiff did not request to only work certain shifts or to not work overtime. Instead, he requested that he work a maximum of sixty-five hours per week and to only work overtime when given advanced notice [Doc. 28-21]. Further, as mentioned above, Plaintiff has submitted evidence showing that Defendant could have accommodated his requests [*See* Doc. 29-15 pp. 8, 10; Doc. 29-16 pp. 5–6]. The Court therefore finds that Defendant has not shown how these requests conflict with an essential function of the position. *Rorrer v. City of Stow*, 743 F.3d 1025, 1043 (6th Cir. 2014) ("Determining whether a function is essential 'is a question of fact that is typically not suitable for resolution on a motion for summary judgment.'" (quoting *Keith*, 703 F.3d at 926)).

Second, Defendant argues that it determined that it was unsafe for Plaintiff to work in an industrial environment. Pointing to the Third Letter, it explains that even if it granted Plaintiff's requested accommodations, Dr. Radoff provided an additional restriction—avoid sudden noises— which it cannot control [Doc. 28 pp. 16–17].[7] Defendant's argument misses the mark. Defendant has provided evidence showing that sudden noises are beyond its control at the facility [*See* Doc. 28-9 p. 18 (Ms. Howerton explaining the constant sudden noises; Doc. 28-16 p. 4 (Mr. Guinn explaining that "[e]very line in the building has machine alarms" which sounds when the machine "faults out and goes down")]. The question, however, is whether there is a reasonable accommodation so that Plaintiff can perform his job function despite the sudden noises. And here,

---

among whom the performance of that job function can be distributed; and/or (3) "[t]he function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function." *Id*. (listing eight pieces of evidence for consideration).

[7]     Dr. Radoff also noted that Plaintiff would need to avoid fatigue and nervousness [Doc. 28-21 p. 2]. The parties, however, do not sufficiently address these restrictions, and Defendant only conclusively asserts that it cannot control them [Doc. 31 p. 3].

Plaintiff suggests that he could have worn noise-canceling headphones or some other protective device [Doc. 29 p. 24].[8]  Defendant has not shown any undue burden with allowing Plaintiff to wear headphones.[9]  *See Fisher,* 951 F.3d at 419 (noting that if one of the plaintiff's "accommodations passes muster, summary judgment in [the defendant's] favor is not appropriate").

Defendant compares this case to *Brown v. Milwaukee Board of School Directors*, 855 F.3d 818 (7th Cir. 2017), but the Court finds this case not applicable.  In *Brown*, the plaintiff was an assistant principal whose medical restrictions precluded her from working near unruly students.  *Id.* at 821.  The Seventh Circuit held that being around potentially unruly students was part of the work environment and was as essential function of the job that could not be modified.  *Id.* at 826–27.  Here, while both Ms. Howerton's and Mr. Guinn's depositions provide support that the workplace has sudden noises, Plaintiff, unlike that in *Brown*, suggests a reasonable accommodation [Doc. 29 p. 24].

Finally, Defendant argues that Dr. Radoff's letter did not unequivocally state that it was safe for Plaintiff to return but stated that it was unsafe for Plaintiff to work in an industrial environment [Doc. 28 p. 9].  Dr. Radoff's letters stated multiple times with his recommended

---

[8]     The Court notes that Plaintiff did not request to wear such a protective device as part of the interactive process, nor did Dr. Radoff suggest that specific accommodation.  However, a "plaintiff must explicitly request an accommodation, unless the employer otherwise knew that one was needed."  *Jones v. Nationwide Life Ins.*, 696 F.3d 78, 89 (1st Cir. 2012).  Further, part of the interactive process requires the employer to engage in good faith and "conduct an 'individualized inquiry' into possible accommodations.  *King v. Steward Trumbull Mem'l Hosp., Inc.*, 30 F.4th 551, 564 (6th Cir. 2022).  Based on Dr. Radoff's letters, Defendant knew Plaintiff required an accommodation regarding sudden noises, but there is no evidence that the interactive process continued after Defendant learned of that requirement.  *Id.* (citation omitted).

[9]     Notably, the job description for an A Tech states that personal protective equipment is required, including mandatory hearing protection [*See* Doc. 28-3 p. 2].

16

accommodations, "[Plaintiff] can return to work as his usual occupation" [Doc. 28-13]. Further, Dr. Radoff's Third Letter does not state that it is unsafe for Plaintiff to work in an industrial environment; it states that if Plaintiff is experiencing certain side effects, such as somnolence or dizziness, from his medication that it would be unsafe for him to "operate industrial equipment" [Doc. 28-21]. And Plaintiff stated in his deposition that he has never experienced dizziness or drowsiness from his medication [Doc. 28-1 p. 15].[10]

To the extent that working in an industrial environment with sudden noises is an essential function of the A Tech position, Defendant has not shown that Plaintiff's requested accommodations would infringe on the essential function and would not make it safe for him to work in that environment.

### 2. Direct Threat

Defendant argues that Plaintiff poses a "direct threat" because (1) epilepsy is a lifelong condition, (2) Plaintiff has had seizures on the job in which he has been injured and taken to the hospital, and (3) these instances show that he poses a risk of future seizures in an industrial environment and that the "risk of harm was imminent" [Doc. 28 pp. 13–14]. Plaintiff argues that Defendant is not able to show that he poses a direct threat because Dr. Radoff's letters do not provide enough information to meet the elements [Doc. 29 pp. 12–18].

"A disabled employee is not 'otherwise qualified' for a job if he poses a 'direct threat' to the health or safety of others that a reasonable accommodation cannot eliminate." *Siewertsen*, 134

---

[10]     Defendant states that Plaintiff admitted during his deposition that his medication makes him sleep [Doc. 28 p. 9 n.25 (citing Doc. 28-1 p. 23)]. In considering Plaintiff's testimony as a whole, it is not clear if Plaintiff meant that he took the medication to make him sleep and that it does not leave him feeling drowsy when he wakes. Regardless, these are facts for the jury to consider.

F. Supp. 3d at 1106 (citing 42 U.S.C. § 12111(3)).[11]  "The direct threat defense must be based on a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence, and upon an expressly individualized assessment of the individual's present ability to safely perform the essential functions of the job." *Chevron U.S.A., Inc. v. Echazabal*, 536 U.S. 73, 86 (2002) (internal quotation marks omitted).  "[A]n employer can not disqualify an applicant simply because of a slightly increased risk of harm." *Backhaus v. Gen. Motors LLC*, 54 F. Supp. 3d 741, 751 (E.D. Mich. 2014).  "The risk must be highly probable and the harm must be substantial." *Id.*  Four factors are considered in determining whether an individual poses a direct threat: "(1) the duration of the risk; (2) the nature and severity of the potential harm; (3) the likelihood that the potential harm will occur; and (4) the imminence of the potential harm." *Id.* (citing  29 C.F.R. § 1630.2(r)).[12]

The Court finds that there are genuine issues of material fact regarding whether Plaintiff is a direct threat.  Plaintiff acknowledges that he has had seizures at work [Doc. 29 pp. 15–16].  Defendant argues Dr. Radoff's Third Letter "made clear that Plaintiff could not safely work in its industrial environment" [Doc. 28 p. 14].  As noted above, Dr. Radoff's Third Letter stated that Plaintiff could not "operate industrial equipment" if he experienced certain side effects [Doc. 28-21].  And his letters state that he could return to work [Docs. 28-13; 28-17; 28-21].  Dr. Radoff added certain restrictions discussed above, and "there is no direct threat defense if the employer

_____

[11]      "There remains some uncertainty in the Sixth Circuit as to which party bears the burden in the direct threat analysis." *Hartmann v. Graham Packaging Co., L.P.*, No. 1:19-CV-488, 2022 WL 219385, at *11 (S.D. Ohio Jan. 25, 2022) (citing *Wurzel v. Whirlpool Corp.*, 482 F. App'x 1, 12 n.14 (6th Cir. 2012)).  The Court does not need to address this issue because regardless of which party possesses the burden, there are genuine issues of material fact on whether Plaintiff poses a direct threat.

[12]      Defendant does not analyze all of these factors in its brief, nor does it address Plaintiff's requested accommodations.

could have made 'reasonable accommodation[s].'" *Moses v. Am. Nonwovens, Inc.*, 97 F.3d 446, 447 (11th Cir. 1996) (citing 42 U.S.C. § 12113(a)).  In light of the above, the Court finds that the jury must weigh and consider these issues [13]

### B.    Disability Discrimination

With respect to Plaintiff's claim of disability discrimination, the *McDonnell-Douglas* burden shifting framework is applicable.  *See Hrdlicka v. Gen. Motors, LLC*, 63 F.4th 555, 566 (6th Cir. 2023) (citation omitted) ("Courts use the *McDonnell Douglas* burden-shifting framework when a plaintiff uses circumstantial evidence to establish disability discrimination under the ADA[.]").  To show disability discrimination, Plaintiff must show: (1) that he is an individual with a disability; (2) that he is otherwise qualified for the position he seeks or holds; and (3) that he was excluded from the position under circumstances that raise a reasonable inference of unlawful

---

[13]    Defendant contends that courts have found that employees pose a direct threat in similar situations [Doc. 28 pp. 14–15 (citing to cases finding plaintiff posed a direct threat)].  The Court has reviewed the cases cited by Defendant and finds them inapposite because the plaintiffs therein were found to be a direct threat based off of the objective medical evidence and there was no medical evidence that supported the view that the plaintiffs were not a direct threat. *Cf. Moses v. Am. Nonwovens, Inc.*, 97 F. 3d 446 (11th Cir. 1996); *Wurzel*, 482 F. App'x 1 (6th Cir. 2012); *Hutton v. Elf Atochem N. Am., Inc.*, 273 F.3d 884 (9th Cir. 2001); *Darnell v. Thermafiber, Inc.*, 417 F.3d 657 (7th Cir. 2005); *Gardner v. Univ. of Conn. Health Ctr.*, No. 3:12-cv-01168-GWC, 2016 WL 4582039 (D. Conn. Sept. 1, 2016).

Relatedly, Defendant argues that a conclusory doctor's note is not sufficient to show Plaintiff is not a direct threat [Doc. 31 pp. 6–7].  The Court finds that the caselaw Defendant cites in support of this argument does not lead to this conclusion.  *See Connors v. Life Ins. Co. of N. Am.*, 2013 WL 1626797 (S.D. Ohio Apr. 16, 2013) (doctor was not aware of the plaintiff's job); *Revels v. Lucent Techs., Inc.*, 60 F. App'x 740 (10th Cir. 2003) (the plaintiff was terminated because she did not provide a doctor's note clearing her to work in compliance with the defendant's policy); *Holtzclaw v. DSC Commc'n Corp.*, 255 F.3d 254 (5th Cir. 2001) (doctor's note was based on the plaintiff's own assertions that were contradicted by the plaintiff's sworn statement that he was completely disabled); *Weigel v. Target Stores*, 122 F.3d 461 (7th Cir. 1997) (the plaintiff represented herself as completely disabled for Social Security benefits); *Michael v. City of Troy Police Dep't*, 808 F.3d 304 (6th Cir. 2015) (the doctor's note stated the plaintiff could not safely perform his job).

discrimination." *Bradshaw v. Goodyear Tire & Rubber Co.*, 485 F. Supp. 2d 821, 826 (N.D. Ohio 2007) (citing *Pesterfield v. Tenn. Valley Auth.*, 941 F.2d 437, 441 (6th Cir. 1991)). If the plaintiff establishes a prima facie case, the burden shifts to the defendant to show a legitimate and non-discriminatory reason for its actions. *Id.* at 827 (citations omitted). Finally, if the defendant does make such a showing, then plaintiff must rebut the proffered reason by producing evidence to show the proffered reason is only a pretext for unlawful discrimination. *Id.* (citations omitted).

The parties do not dispute the first element (i.e., whether Plaintiff has a disability). Defendant argues, however, that Plaintiff cannot establish all the elements of a prima facie case of disability discrimination because he is not otherwise qualified. As discussed above, Plaintiff has put forth sufficient evidence showing that he is otherwise qualified with reasonable accommodations. *See supra* Section IV.A.1. It is undisputed that Plaintiff was terminated from his job [*See* Doc. 28 p. 1; Doc. 29 p. 6], that Defendant knew of Plaintiff's disability when it hired him [Doc. 28 p. 2 n.3 (citing Doc. 28-2, Pre-Employment Physical Results Form)], and that Defendant fired Plaintiff for a reason relating to his disability [*Id.* at 1; Doc. 29-7]. Together, these facts raise a reasonable inference of unlawful discrimination.

Defendant claims that it terminated Plaintiff's employment because it could not accommodate "his restrictions" to make it safe for him to work in an industrial environment [Doc. 29-7]. For the same reasons as articulated above, the Court finds that Defendant has not met its burden. Even if this was sufficient to meet its burden, the Court finds that Plaintiff has sufficiently shown that this reasoning may have been a pretext for unlawful discrimination. Plaintiff points out that Defendant did not follow up with Dr. Radoff as to whether Plaintiff experienced any side effects from his seizure medication [Doc. 29 pp. 14–15]. Further, Dr. Radoff's Third Letter does not say that it is unsafe for Plaintiff to work in an industrial environment; it says that if Plaintiff is

experiencing certain side effects from his medication that it would be unsafe for him to "operate industrial equipment" [Doc. 28-21]. Therefore, the Court finds that a reasonable jury could find that Plaintiff was terminated on the basis of his disability from his position that he was otherwise qualified to hold with reasonable accommodations.

## V. CONCLUSION

Accordingly, for the reasons explained above, the Court **DENIES** Defendant's Motion for Summary Judgment [**Doc. 27**].

**IT IS SO ORDERED.**

ENTER:

Debra C. Poplin
United States Magistrate Judge

21